In the Matter of Emily Jo
WALTERS, Debtor.

Emily Jo WALTERS, Petitioner,

v.

Floyd HATCHER, and Nellie
Hatcher, Respondents.

Bankruptcy No. 81–01236–SJ.

United States Bankruptcy Court,
W.D. Missouri,
St. Joseph Division.

June 4, 1984.

Steven C. Block, Paxton & Block, P.C., Independence, Mo., for petitioner.

David Q. Reed, Kodas, Reed & McFadden, P.C., R. Britt Carlson, Jones & Frankum, Kansas City, Mo., for respondents.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, ORDER VACATING JUDGMENT OF JULY 7, 1982, AND FINAL JUDGMENT AWARDING PETITIONER THE SUM OF $4,283.48

DENNIS J. STEWART, Bankruptcy Judge.

Presently pending before the court is the motion of the respondents to set aside a judgment formerly issued by this court for the petitioner and against the respondents in the sum of $13,276.14. The judgment was issued after a hearing which was held in the respondents' absence when they did not appear therefor although the records of the court purported to show that their counsel had received adequate prior notice of the hearing which was held on April 28, 1982. Accordingly, the petitioner's testimony as to the value of the household furniture and effects which had been sold in violation of the automatic stay was uncontradicted and was accordingly accepted by the bankruptcy court.

It was the contention of the respondents, however, that they did not receive timely notice of the hearing; nor of the order to account for the proceeds of sale which was entered prior to the hearing; nor of the final judgment. Hence, they contend, they should be granted relief from the judgment. Further, they contended that they had a good and meritorious defense on the damages issue inasmuch as the petitioner had made a prior inconsistent statement on her schedules that the household furniture and effects had only a value of $1,350.00.

Accordingly, the court, on the dates of December 20, 1982 and April 26, 1983, conducted its hearing on the issues of whether the former and challenged judgment should be set aside and on the merits of the issue of damages.

The evidence on the issue of whether the judgment should be set aside because of improper notice to counsel for the respondents demonstrated that the former counsel for the respondents, Joseph Kevin Kirwin, closed his law office on or about December 28, 1981, and thereupon became an assistant city attorney for the City of St. Joseph, Missouri; that this court, on May 25, 1982, issued a written order directing the respondents to account explicitly for the sale of the debtor's household goods or else answer in judgment for the difference in value and also pay other compensatory fines for civil contempt; that subsequently, other orders were also issued, and among them was an order of March 30, 1982, setting a hearing on the issues for April 28, 1982; that the orders were mailed to Mr. Kirwin at his former law office located at 620 Edmond in St. Joseph, which he had shared with another attorney, Arthur J. Meers; that the letters were never forwarded to him because whoever received them in the former office simply put them in the drawer of his old desk; that he believed that he had sufficiently forewarned the court of his change of address by virtue of his letterhead containing the address of P.O. Box 701, St. Joseph, Missouri 64502, which it continued to be after December 28, 1981; that he also failed to receive the final judgment of July 7, 1982, awarding the petitioner the sum of $13,276.14 in damages against the respondents; that he nevertheless was advised timely and early in April 1982 [1] by the secretary to

---

**1.** The evidence was in conflict on this issue, with Mr. Kirwan denying the secretary's testimonial statement that she spoke with him early in April 1982 about the forthcoming hearing on April 28, 1982. Further, Mr. Kirwan contends that, when he did learn about the hearing, he had no time to do anything except to forward the written request for continuance to the court,

the attorney for the petitioner, of the hearing to be held on April 28, 1982, and that, rather than attend the hearing, he filed a motion for continuance which was received by the court on the date of April 28, 1982, the date of the hearing itself. The court, because of the untimeliness of the request for continuance, and because the other parties and counsel were assembled before it at the time it received the motion for continuance, proceeded with the hearing of the merits and, on the basis of the uncontradicted evidence then presented by petitioner, issued its aforementioned judgment of July 7, 1982, in favor of petitioner and against respondents in the sum of $13,-276.14.

The respondents also presented evidence to demonstrate that the property which was the subject of that judgment had previously been sold at auction and that the total proceeds of the sale was the sum of $3,006.30, all but $679.63 of which had been set off by the respondents as the lawful storage charges and the costs and expenses of the sale; that the auctioneer who conducted the sale, William E. Purvis, believed, according to his professional opinion, that that was the fair market value of the property; that there were 54 registered bidders in attendance at the sale and "that establishes your market value"; that, in all, there were more than 100 potential bidders at the sale and the property therefore must be regarded as having sold for fair market value; that all of the goods owned by the petitioner which had been stored by the respondents were sold and that the sum of $2,326.67 was, according to the testimony of the respondents, the total "fair and reasonable charge" deducted from the sale proceeds for storage charges and the costs and expenses of sale, thus leaving the sum of $679.63 for the debtor. The debtor testified as to the value of the property, admitting that she had previously, in her bankruptcy petition, listed her personal property as having a fair market value of only $1,350.00, and that that figure was correct, but that, considering the special value to her, it had the total value of $13,845.00 which she had testified that it had in the prior hearing of April 28, 1982. She further stated that some of the property was in the nature of antiques, for example, certain articles from the World War I era in Germany, certain Indian glass beads which had been in the possession of her and her family for more than twenty years, and some pictures which had belonged to her mother. She further stated that there were five oil paintings, which she valued at $600.00, which had been painted by some of her relatives, who were professional artists. Her statement was that the value of $13,845.00 would not be sufficient to replace such articles as had a special value to her.

■ The respondents, on the basis of the foregoing evidence, seek to have the judgment of July 7, 1982, vacated and set aside for failure of the court to grant adequate notice to them of the hearing of April 28, 1982, on which that judgment was based. But this court believes that it is an adequate basis for relief from the former judgment that, in the hearing of April 28, 1982, the debtor Emily Jo Walters' testimony as to the value of her personal property which was sold in violation of the automatic stay was mistakenly elicited, rendered and perceived as if it were testimony as to the fair market value of the property. Accordingly, the court issued its judgment directly in accordance with the debtor's testimony, which it assumed to be the admissible expert testimony of the owner of the property of fair market value.[2] Now, however, as above demonstrated, the debtor's contention is that her testimony was not of fair market value, but of the subjective value of the property *to her*. This is a type of evidence which, under the principles relating to the weighing of evidence, may and should be weighed and questioned by the

---

which reached the court only as the hearing was commencing.

**2.** An owner's testimony is ordinarily considered the equivalent of expert testimony of value and, in the absence of countervailing expert testimony, usually binding upon the trier of fact.

trier of fact, even when uncontradicted. It plainly does not have the same degree of mandatory acceptance as uncontradicted expert testimony of fair market value.[3] And this mutual mistake, whereby the debtor was testifying respecting the subjective value of the property to her and the court and her counsel believed that she was testifying as to fair market value is the type of extrinsic mistake which, regardless of the merits of the contention of absence of notice of the trial and judgment, warrants relief from judgment under Rule 60(a) of the Federal Rules of Civil Procedure and Rule 924 of the Rules of Bankruptcy Procedure.[4] Accordingly, for this reason, the judgment of July 7, 1982, should be vacated and set aside and the merits re-examined.

In this regard, the hearing which was held on April 28, 1983, took place pursuant to a notice which clearly indicated that it would be held upon the merits as well as upon the issue of whether the challenged judgment should be set aside.[5] Further, both the petitioner and the respondents, as summarized above, offered evidence which went to the merits as well as to that of whether relief from the former judgment should be granted. This has been done without any objection by any of the parties. Accordingly, these issues have been re-tried, if not explicitly, at least by implication within the meaning of Rule 15 of the Federal Rules of Civil Procedure and the analogous rule of bankruptcy procedure.[6] Accordingly, the matter before the court is ripe for a decision of the merits.

 Yet, in rendering such a decision, the court is not free to conclude that there was no violation of the automatic stay, as was concluded, on the basis of the following reasoning, in the order of September 24, 1981:

determinable by analogy to the definition which is used for extrinsic fraud. "Fraud is extrinsic where a party is prevented by trick, artifice or other fraudulent conduct from fairly presenting his claim or defenses or introducing relevant and material evidence." 7 Moore's Federal Practice para. 60.37(1), pp. 60–374, 60–375 (1983). In this action, the mistake would have prevented the court from considering the evidence in its proper light and therefore can be said to have prohibited the consideration of the material portion of the evidence.

**3.** Cf. note 2, *supra.* When it comes to the issue of "special value," although a witness may testify to the facts and circumstances which underlie that special value, the opinion ordinarily has no binding effect upon the trier of fact. "Neither (an owner nor a transferee thereof), by way of opinion evidence, would have been permitted to urge his own idea of the special value of the heirloom to himself as the measure of his recovery, but rather the jury was obliged to ascertain the amount of the damages in the light of all the facts and circumstances in the case." *Kalinowski v. M.A. Newhouse & Son, Inc.,* 53 S.W. 1094, 1096, 1097 (Mo.App.1932); *State ex rel Terry v. Ace Storage & Moving Co., Inc.,* 135 S.W.2d 363, 368 (Mo.App.1940).

**4.** "Relief from a judgment ... on the basis of accident or mistake is less common than relief on the basis of fraud, but, nevertheless, both accident and mistake afford the basis for relief in an appropriate situation .... Relief may also be granted on the basis of extrinsic mistake; and mutual mistake of fact." 7 Moore's Federal Practice para. 60.37(1), pp. 60–381, 60–382 (1983). "(A) federal court ... has jurisdiction to modify a final judgment ... on the ground of mistake as well as fraud, at least where mutual mistake is shown and where the party seeking relief is without fault or negligence in the premises." *West Virginia Oil & Gas Co. v. George E. Breece Lbr. Co.,* 213 F.2d 702, 706 (5th Cir.1954). In this case the mistake was mutual, in that the court and counsel for the debtor assumed that her testimony was as to its fair market value. It was also extrinsic. This is

**5.** The court initially entered its order on March 15, 1983, setting a hearing on March 29, 1983, stating in part that "(c)areful consideration ... tends to show the wisdom of rehearing the merits of this action before making a decision as to whether the former judgment should be set aside. In this manner, appellate review, if any, may take place on the basis of all the available evidence on the issues." Subsequently, on March 28, 1983, it was necessary for the court to issue its order continuing the hearing to April 28, 1983.

**6.** See note 5, *supra.* "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Rule 15(b), F.R.Civ.P. Further, as noted in note 5, *supra,* the court framed the issues for the hearing to include both the issues of the merits and that of whether the judgment should be set aside.

"According to the testimony then adduced by the respondent in this hearing, Mr. Eveloff conveyed word by telephone to Mrs. Hatcher the night before the scheduled sale of Mrs. Walters' furniture that Mrs. Walters was 'filing bankruptcy' and accordingly advised her not to go on with the sale, saying that she was 'being unreasonable' in insisting on proceeding with the sale. The sale was conducted as scheduled, however, and the sum of $679.30, she states, now remains from the proceeds of sale after subtraction of the contendedly reasonable storage charges, which were, in the hearing of August 17, 1981, submitted to the court in the form of documentary evidence.

"The uncontradicted evidence thus submitted demonstrates a violation of the automatic stay. Even if Mrs. Hatcher's testimony must be accepted in full, it shows that, with actual notice the petitioner had commenced title 11 proceedings, the respondent, under her direction, proceeded to sell and dispose of the petitioner's property. It is the respondent's contention, made testimonially by Mrs. Hatcher in the hearing of August 17, 1981, that she had no actual notice that Mrs. Walters had actually filed the petition for relief under title 11 because Mr. Eveloff only made over the telephone to her a general and ambiguous statement to the effect that Mrs. Walters 'was taking bankruptcy' and this statement might have meant that Mrs. Walters was simply preparing to file a petition. But the further statements which Mrs. Hatcher admits Mr. Eveloff made to her—to the effect that the sale should not be held as scheduled and that she was 'being unreasonable' in insisting on going ahead with the sale—should have been sufficient to cure any ambiguity and constitute advice that a petition had actually been filed. Mrs. Hatcher proceeded with the sale at her risk from this point on."

There is no evidence to impugn these findings and conclusions and the facts which constitute the violation continue to be admitted by the respondents.[7] But it is the contention of the respondents that the compensatory damages which may be granted for violation of the automatic stay, see *In re Brooks*, 12 B.R. 283 (Bkrtcy.W.D.Mo. 1981), and cases therein cited, must be limited to the $679.63 net proceeds of sale of the goods which they have formerly turned over to petitioner. But the purpose of the granting of compensatory relief for violation of the automatic stay is to restore the *status quo* and grant the injured party the value of its loss. *In re Brooks, supra.* "Compensatory civil contempt reimburses the injured party for the losses and expenses incurred because of the adversary's noncompliance." *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 829 (5th Cir. 1976); *In re Rogers Oil Co.*, 17 B.R. 319, 321 (Bkrtcy.W.D.Ark.1982). Accordingly, the court must award the debtor the value of her property which was sold in contravention of the automatic stay and her reasonable attorney's fees and expenses caused by the violation. *In re Brooks, supra*, at 285–286. On the question of value, the respondents contend that the court must now be bound by the results of the auction sale and find that the damages do not exceed the $3,006.30 then realized. The only testimony which is arrayed against that finding is that of the debtor, which as noted above, seeks to add a "subjective" value to the actual fair market value. "An award of compensatory damages, costs, and attorney fees is not punitive in nature, but rather is designed to indemnify and make the Debtor whole for losses suffered by reason of the wrongful acts of the contemnor." *Matter of Preferred Surfacing*, 3 B.C.D. 94, 96 (N.D.Ga. 1976). In restoring the value of the property taken by the violation of the automatic

---

**7.** It should be noted that, although the court granted the respondents an explicit opportunity to offer evidence on this issue, see note 5, *supra*, they failed to offer any evidence which would disturb the court's former findings. Those findings, moreover, were made on the basis of their own testimony.

stay, the court must employ the standard rule that the value to be restored is the value of the property to the debtor. "According to the great weight of authority, the measure of damages for the conversion of household goods, furniture, books, manuscripts, or wearing apparel, kept and adapted for personal use, is not the second hand market value of property, but the actual and fair value *to the owner*, excluding any fanciful or sentimental value to the owner". 89 C.J.S. Trover and Conversion sec. 196, p. 658. (Emphasis added.) Thus, while the fair market value is the usual and ordinary measure of damages, the law of damages recognizes that the court may consider any special or heirloom value which the property may have; that the injured party should be made whole, not only by recovery of "the intrinsic or market value" of the personal property, but also its "special and extrinsic value." *Kalinowski v. M.A. Newhouse & Son*, 53 S.W.2d 1094, 1096 (Mo.App.1932). In assessing this special value, the trier of fact is granted particular latitude to assay all the facts and circumstances of the case. As noted above, in making the determination of special value, the trier of fact is not bound by opinion evidence, "but rather [is] obliged to ascertain the amount of the damages in the light of all the facts and circumstances of the case." *Id.* at 1097. "The question of such valuation [is] peculiarly one for the jury [or other trier of fact] in the light of all the facts and circumstances of the case." *State ex rel. Terry v. Ace Storage and Moving Co.*, 135 S.W.2d 363, 368 (Mo.App.1940). In considering the relevant facts and circumstances, the court must note that the market value of the property which was taken in violation of the automatic stay cannot be less than the $3,006.30 for which it was auctioned. The respondents, by means of their own evidence, support and sponsor that proposition. The real question for the trier of fact is the extrinsic and special value of the property. In this regard, the debtor testified without contradiction that the taken property included some artifacts from Germany in the World War I era, some Indian glass beads which she and her family had had for some two decades, and some paintings which two of her children, who are professional painters, had made for her. The paintings which she referred to she stated would have a value of around $600.00. She also stated that there were other items having special value among the other items which were taken and that her testimony in the hearing of April 28, 1982, as noted above, that their total value was in excess of $13,000.00 was intended to include this special value. The court has further reviewed the list of the personalty which was offered in evidence during the trial of this case and has noted that it is punctuated with references to "keepsakes" and other items which could reasonably be expected to have a special value to their owner.[8] Still, it is difficult to imagine, on the basis of the rather general evidence before the court, how the special value of the property could, in the debtor's eyes, exceed the fair market value by a full $10,000.00. On the basis of all the facts and circumstances, the court finds that the combined value of the property taken, including the special value to the owner, was $4,700.00.[9]

The costs of storage and other costs and expenses of the unlawful sale have been deducted previously by the respondents from the $3,006.30 which was realized from the auction sale to produce a difference of some $679.30 which, as noted above, has been previously offered to the petitioner as the respondent's measure of

---

8. The court, of course, is not entitled to use its imagination in this regard, but the list of personalty which was introduced in evidence without objection contains references to several pieces of jewelry; to "albums," to pictures, to books and the like, which the debtor estimates to have a value exceeding $10,000. That the total of their value likely exceeded $4,000, more-

over, is evidenced by the fact that they brought slightly in excess of $3,000 at auction. Accordingly, without speculation, it can be concluded that the property has a reasonable value, including the special value, of $4,700.

9. See note 8, *supra.*

liability. The debtor has contested the charges having been made, principally on the grounds that they are not reasonable under the circumstances. In making the determination of what should be restored to a debtor who has been harmed by a violation of the automatic stay, the court of bankruptcy can set off the reasonable amounts owed to a creditor prior to violation of the stay, but it can hardly ratify and legalize the unlawful sale conducted in violation of the automatic stay without undermining both the bankruptcy law and the purpose of the contempt action. It is the injured party, the debtor, who is to receive the costs and expenses which the unlawful violation of the automatic stay has caused him or her. Accordingly, the costs and expenses of the unlawful sale cannot be set off against the amount which the debtor is to receive as compensatory relief. The evidence shows that the presale storage and packing charges are the sum of $1,366.52, prior to the time of the sale.[10] Therefore, these lawful and reasonable charges, unrelated to the unlawful sale, but valid and enforceable prior to the date of bankruptcy and the date of the sale, can and will be allowed as a setoff against the $4,700.00 which is due as the compensatory relief to the petitioner.

Finally, the attorneys for the debtor have submitted a claim for attorney's fees, which the court has reviewed in combination with the facts and circumstances of this case. In this regard, the respondents have had ample opportunity to respond to the detailed statements submitted by attorneys for the petitioner in support of the attorney's fees. They have not, in the time permitted by the local

rule,[11] taken any exception to the services claimed to have been performed by the attorneys for the debtor. Under such circumstances, the court is not required to conduct a hearing on the issue of the reasonableness of the award of attorney's fees. See, e.g., *Lindy Bros. Bldrs., Inc., of Phila. v. American R & S San. Corp.*, 487 F.2d 161, 169 (3d Cir.1973), to the following effect:

> "Courts have noted that expert testimony is not necessary to establish the value of a lawyer's services and have, on that ground, sanctioned the award of attorneys' fees on the basis of affidavits without a hearing ... A judge is presumed knowledgeable as to the fees charged by attorneys in general and as to the quality of legal work presented to him by particular attorneys; these presumptions obviate the need for expert testimony such as might establish the value of services rendered by doctors or engineers ... [except] where the facts to be weighed in light of the judge's expertise are disputed."

In making the award of attorneys fees, the court has considered all the facts and circumstances relevant thereto, including the time spent, the quality of the services rendered and their value, the result produced, the skill required, and the benefit conferred on the debtor. In considering all of these circumstances, the court has concluded that the award to the attorneys for the trustee should be $950.00. It is recognized that, intrinsically, the efforts of these attorneys probably warrant more in the way of an award, under the circumstances of this case.[12] Still, however, without a showing

---

**10.** Nellie Hatcher testified in the course of the hearing of April 28, 1983, that the presale charges were $1366.52, including storage, packing and loading charges. The remainder of the $2326.67 deducted by them from the total price realized ($3006.30), related to the costs of the sale.

**11.** "If the respondent opposes a motion, he shall file his response ... within seven (7) days after service of the motion." Rule 16(F) of the Local Rules of Bankruptcy Practice.

**12.** The attorneys for the debtor request in excess of $3,000 in attorney's fees and the time and services rendered would ordinarily warrant this magnitude of an award. But the award must necessarily be measured by the result produced and therefore bear some reasonable relationship to the damages which are awarded to the client. The skill required by the tasks in this case and the skill exercised must accordingly go in large part unrewarded because of this basic principle.

of very exceptional circumstances, the action at bar was simply one for violation of the automatic stay, and the violation was established in proceedings which were completed before the major work of the petitioner's current attorneys was commenced.[13] The court therefore awards the sum of $950.00 to the debtor for her attorney's fees, an amount which is to be super-added to her recovery of the sum of $4,700.00 less the $1,366.52 in allowable setoff. The total amount of her recovery from the respondents should therefore be, under all the facts and circumstances of this case, the sum of $4,283.48.

## Jurisdiction

There has been no challenge to jurisdiction by any of the parties. Still, it has been noted in other contexts that the current jurisdiction of the bankruptcy court is, to say the least, open to question.[14] But the courts have had repeated occasion to observe that the prohibitions of *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), particularly as they relate to contempt proceedings, operate only prospectively after December 24, 1982.[15] Further, in seeking to enforce the automatic stay, it appears that the court may enjoy an inherent power which is residual in all courts to enforce their own judgments. "There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384

U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966). This is especially so when the automatic stay sought to be enforced was in effect long before the effective date of the *Marathon* decision, *supra*. "That a federal court of equity has jurisdiction of a bill ancillary to an original case or proceeding in the same court, whether at law or in equity, to secure or preserve the fruits and advantages of a judgment is well settled ... And this, irrespective of whether the court would have jurisdiction if the proceeding were an original one. The proceeding being ancillary and dependent, the jurisdiction of the court follows that of the original cause." *Local Loan Co. v. Hunt*, 292 U.S. 234, 239, 54 S.Ct. 695, 697, 78 L.Ed. 1230 (1934). Further, even these enforcement proceedings were commenced prior to the decision in *Marathon, supra*.[16] This court therefore concludes that it has jurisdiction to enter an order granting the relief demonstrated to be lawful and proper.

## Judgment

Accordingly, for the foregoing reasons, it is hereby ORDERED AND ADJUDGED that the petitioner have and recover the sum of $4,283.48, from the respondents.

---

**13.** The actual violation of the automatic stay was the subject of this court's order of September 24, 1981, based on a hearing which took place prior to the time when the debtor's current counsel entered their appearances in this matter.

**14.** "The (current) enactment, by its own literal terms, purports to resurrect, as the applicable jurisdictional statute, section 241 of the Bankruptcy Reform Act of 1978. For the effect of section 404(b) of the Bankruptcy Reform Act of 1978 is expressly extended by the new enactment. Its letter, in turn, provides that, during the period for which it is extended, the currently sitting bankruptcy judges 'shall serve in the court of bankruptcy ... *in the manner prescribed by this title.*' (Emphasis added.). That

title, Title IV of the Bankruptcy Reform Act of 1978, Pub.L. 95–598, provides at sections 405(a) and (b) that the bankruptcy judges now sitting may exercise the 'jurisdiction and powers conferred by,' *inter alia*, section 241 of the Bankruptcy Reform Act, the same section which the plurality opinion in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), held to be within the competence only of an Article III court." *Matter of Lenz*, In proceedings for reorganization under chapter 11 of the Bankruptcy Code, 39 B.R. 444 (Bkrtcy.W.D.Mo.1982).

**15.** See *Lindsey v. Ipock*, 732 F.2d 619 (8th Cir. 1984).

**16.** See note 15, *supra*.